UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES MASON BUSSMAN,

    Plaintiff,

    v.

UBER TECHNOLOGIES, INC., *et al.*,

    Defendants.

Civil Action No. 24-1316 (JEB)

### MEMORANDUM OPINION

Pedestrian Charles Bussman was struck and injured in 2021 by an Uber driven by Bruceline Fru. Two years later, Bussman and Uber's insurer engaged in settlement discussions. The wheels eventually came off, and the parties now dispute whether those discussions ever culminated in an agreement. Bussman filed this action for damages in May 2024 against Uber Technologies, Inc.; its subsidiary Rasier, LLC; and Fru. Defendants now move to dismiss and for judgment on the pleadings or, in the alternative, for summary judgment and enforcement of the purported settlement. Fru separately believes that Bussman's claim that he violated a D.C. statute banning distracted driving is facially infirm. At this stage, the Court sides with Bussman as to the settlement agreement but enters judgment on one count for Fru.

**I.    Background**

On May 10, 2021, Fru was working as a driver for Uber. See ECF No. 3 (Am. Compl.), ¶¶ 81–85. While completing a ride in northwest Washington, Fru struck Bussman as he was crossing the street. Id., ¶ 102. Plaintiff was "thrown violently into the air and onto the roadway," suffering "serious, severe, significant, and permanent injuries," id., ¶ 104, to (really) his "head, shoulders, knees, and toes." ECF No. 12-3 (Bussman Letter) at ECF p. 2. Those

1

injuries, which "limited and will limit his usual activities," "necessitated medical evaluation and treatment" and "will require ongoing treatment." Am. Compl., ¶¶ 115, 130. According to Bussman, Fru was distracted by the Uber Driver app on his smartphone, which "sen[ds] time-sensitive notifications and electronic messages" to drivers and "financially incentivizes them to pay attention to these notifications and messages as well as timely respond to them." Id., ¶¶ 97–102.

In October 2023, counsel for Bussman sent a letter to Farmers Insurance Exchange (Uber's insurer) demanding the maximum compensation permitted by the policy, see Bussman Letter at ECF p. 3 — in this case, $1,000,000. See ECF No. 12-2 (Uber Mot.), ¶ 3. Amanda Kragouras, the assigned insurance adjuster, received authorization from a supervisor to settle Bussman's claims for the full amount. See ECF No. 12-5 (Aff. of Amanda Kragouras), ¶ 11.

Following that authorization, on November 28, Kragouras informed Bussman's counsel Damien Smith over the phone that Farmers would compensate Bussman $1,000,000 to settle his claims. Id., ¶¶ 12–13. The parties dispute what Smith said in response. See id. (stating that Smith "verbally accepted" the offer); ECF No. 22-5 (Aff. of Damien Smith), ¶ 16 (declaring that Smith "did not, orally or in writing, accept Farmers Insurance's offer to settle"). The same day, Kragouras sent Smith a letter confirming the agreement as well as a release for Bussman to sign. See Kragouras Aff., ¶ 14; ECF No. 12-6 (Nov. 28 Letter). Smith responded that he "would contact Plaintiff regarding the offer, but that Plaintiff needed to work through some things, including, but not limited to, potentially setting up a trust, before Plaintiff could agree to any potential settlement." Smith Aff., ¶ 18.

Thus Smith and Kragouras embarked upon a winding road that would take months to travel. In late December 2023, Kragouras reached out to Smith inquiring about the status of the

release, see ECF No. 22-8 (Email Thread) at 5, and Smith replied that Bussman's family would be "setting up the needed arrangements for the settlement funds in January," at which point he would "finalize everything" with Plaintiff and send the executed agreement. See id. After several weeks passed, Kragouras followed up two more times and eventually received a message from Smith reiterating that Bussman was "making arrangements for receiving the settlement funds this month and will sign the release after that is completed." Id. at 3–4. Kragouras emailed Smith again on February 15, 2024, and was told that Bussman "had to be out of town last month for a family emergency." Id. at 2. Undeterred, Kragouras emailed Smith twice more, see id. at 1, until Smith finally slammed on the brakes at the end of March. At that time, he informed Kragouras that Bussman had "instructed [counsel] to proceed with litigation." See ECF No. 12-13 (Mar. 28 Email). Smith declared that Bussman "has not formally accepted settlement or executed a release" and that "[a]ny statements prior to this communication that were understood as representations that our client has accepted settlement are rescinded." Id.

True to his word, Bussman filed this lawsuit against Uber and Rasier (referred to jointly here as Uber), as well as Fru, in May. He brings ten counts against Defendants, including — as relevant for our current purposes — negligence *per se* for statutory violations (Count X). See Am. Compl., ¶¶ 253–72. Uber filed its dispositive Motion in July, and Fru followed shortly thereafter. Before proceeding, the Court notes that Uber frames its Motion as a "Motion to Dismiss, or in the alternative, Motion for Summary Judgment and to Enforce Settlement." Uber Mot. at i (capitalization altered). Because Uber relies on facts not listed in the Complaint, however, its Motion cannot be treated as a motion to dismiss and instead is properly viewed as a motion for summary judgment. See Pinson v. DOJ, 69 F. Supp. 3d 125, 129 (D.D.C. 2014). For the same reasons, the Court treats the portion of Fru's "Motion for Judgment on the Pleadings or,

in the Alternative, Motion for Summary Judgment and Motion to Enforce Settlement" relating to the existence of a settlement agreement as a motion for summary judgment. See ECF No. 20-1 (Fru Mot.) (capitalization altered). The rest of Fru's Motion relies only on legal arguments, however, and the Court consequently treats those portions as a motion for judgment on the pleadings.

## II. Legal Standard

### A. Summary Judgment

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).

4

B.  Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed — but early enough not to delay trial." A party seeking judgment on the pleadings must demonstrate "that no material fact is in dispute and that it is entitled to judgment as a matter of law." Dist. No. 1 v. Liberty Maritime Corp., 933 F.3d 751, 760 (D.C. Cir. 2019) (cleaned up).  When deciding such a motion, a court "accept[s] as true the allegations in the opponent's pleading, and as false all controverted assertions of the movant."  Id. at 761 (cleaned up).  "[A] judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial."  Id. (quoting Wager v. Pro, 575 F.2d 882, 884 (D.C. Cir. 1976)); see also Tapp v. Washington Metro. Area Transit Auth., 306 F. Supp. 3d 383, 391 (D.D.C. 2016) ("Because a Rule 12(c) motion would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, the Court must treat such a motion with the greatest of care and deny it if there are allegations in the complaint which, if proved, would provide a basis for recovery.") (cleaned up).  The appropriate standard for reviewing a 12(c) motion is therefore similar but not identical to that applied to a motion to dismiss under Rule 12(b).  See Samuels v. Safeway, Inc., 391 F. Supp. 3d 1, 2 (D.D.C. 2019); see id. (noting that "a Rule 12(b) motion may be based on procedural failures, including lack of subject-matter jurisdiction," while "a Rule 12(c) motion centers upon the substantive merits of the parties' dispute") (cleaned up).

**III.    Analysis**

Defendants Uber and Fru make largely intersecting arguments in favor of summary judgment.  The Court accordingly first addresses Uber's contention that an enforceable

5

settlement agreement exists before turning to Fru's argument that Plaintiff's negligence allegations are insufficient.

### A. Uber

"It is well established that federal district courts have the authority to enforce settlement agreements entered into by the litigants in cases pending before them." Demissie v. Starbucks Corp. Off. & Headquarters, 118 F. Supp. 3d 29, 34 (D.D.C. 2015) (internal quotation marks omitted), aff'd, 688 F. App'x 13 (D.C. Cir. 2017).  D.C. law, which governs here under choice-of-law principles, provides that a settlement agreement, like any contract, is enforceable if there was "(1) an agreement to all material terms, and (2) [the] intention of the parties to be bound." Duffy v. Duffy, 881 A.2d 630, 634 (D.C. 2005).  "Which of the parties' agreement terms are material is a question of fact." Demissie, 118 F. Supp. 3d at 34.  Terms crucial to informing parties "how they are expected to perform," such as "the amount to be paid and the release of liability," are generally found to be material.  Id. at 35 (internal quotation marks omitted).  As for intent to be bound, courts look to "written materials, oral expressions and the actions of the parties" as indications of the requisite intent.  Duffy, 881 A.2d at 637.  A signed written agreement is the "clearest evidence of mutual assent to the terms of the document," but is not necessary to show a mutual agreement to be bound.  Id.

Uber insists that Smith verbally entered into a settlement contract on Bussman's behalf on November 28, 2023, and repeatedly confirmed that contract in his ensuing email exchanges with Kragouras.  See Uber Mot. at 10, 13.  The Court separately assesses whether there was agreement to all material terms and whether the parties intended to be bound.  See Blackstone v. Brink, 63 F. Supp. 3d 68, 77–78 (D.D.C. 2014) (taking this approach).

Uber argues that, because Plaintiff had previously demanded $1,000,000 in compensation, when Kragouras stated on the phone on November 28 that Farmers was willing to pay that amount, she accepted Bussman's offer and thus formed a binding contract. See Uber Mot. at 7; ECF No. 26 (Uber Reply) at 3. Smith, conversely, avers that he understood Kragouras to be "relay[ing] an offer of their purported policy limits of One Million Dollars" but insists that he "did not, orally or in writing, accept" that offer. See Smith Aff., ¶¶ 15–16. Because the Court, viewing the evidence in the light most favorable to Plaintiff, can draw a justifiable inference that Smith never accepted an offer for Farmers to compensate Bussman $1,000,000, it cannot conclude at summary judgment that Kragouras and Smith came to rest on the key terms of the agreement — namely, the amount to be paid and Bussman's release of liability.

While this would be sufficient to deny the Motion, there is more. For example, Kragouras and Smith did not discuss their expectations regarding confidentiality and nondisparagement during the November 28 phone call. True, a contractual term is generally not considered material if neither party mentions it while negotiating the settlement and only raises it after an agreement has been reached. See Blackstone, 63 F. Supp. 3d at 77; Dyer v. Bilaal, 983 A.2d 349, 358 (D.C. 2009) (finding that confidentiality clause was not material term in part because neither party mentioned confidentiality while negotiating or accepting settlement). And "if the parties have reached an agreement as to all material terms, a party's misgivings about other terms 'do not constitute grounds for relieving a party of his obligations to comply' with the agreement." Blackstone, 63 F. Supp. 3d at 77 (quoting Williams v. WMATA, 537 F. Supp. 2d 220, 222 (D.D.C. 2008)). Bussman, then, could not escape the obligation to comply with an agreed-upon settlement by raising new doubts about nonmaterial terms after the fact. Here, however, Smith has declared that he "would not have agreed to" any requirements that he "be

7

bound by both the confidentiality and non-disparagement clauses of the release." Smith Aff., ¶ 20. Because the evidence that Kragouras and Smith reached an agreement on the November 28 call is mixed at best, the Court will draw the inference that Smith indeed viewed confidentiality and nondisparagement provisions as material terms and would not have agreed to a settlement without first negotiating them. Employing the deferential summary-judgment standard, the Court therefore concludes that the parties did not agree on the contract's material terms.

Even if they had, however, Defendants hit another roadblock: the Court must also find that "the parties intended to be bound by their words alone." Blackstone, 63 F. Supp. 3d at 78. As our Circuit has explained, intent to be bound by oral representations does not exist if "either party knows or has reason to know that the other party regards the agreement as incomplete" or intends to be bound only by a later written agreement. See Steven R. Perles, P.C. v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007) (quoting Restatement (Second) of Contracts § 27 cmt. b (Am. L. Inst. 1981)). To determine whether parties intended to be bound by oral statements, courts look to "the parties' conduct after they reach an alleged oral agreement," id., as well as "the importance of the transaction and amount of money (or other rights) at stake." Blackstone, 63 F. Supp. 3d at 78.

The Court finds illuminating the written communications between Kragouras and Smith following the November 28 phone call. In those messages, both clearly viewed the existence of a signed written agreement as important — and even critical — to the settlement process. For example, immediately after the call, Kragouras sent Smith a written agreement along with a letter requesting execution. She then sent him no fewer than six emails (on December 20, January 11, January 25, February 15, March 7, and March 28) following up on the status of the release and asking for updates on when it would be executed. See Email Thread. Indeed, Smith declares

8

that "[d]uring settlement negotiations, [he] understood . . . that a signed release would be needed to enter into any settlement agreement." Smith Aff., ¶ 11. Kragouras's course of conduct, as well as Smith's responses, thus demonstrate that neither person believed their oral conversation was sufficient to bind Farmers and Bussman to an agreement.

In particular, Smith repeatedly noted that Bussman and his family needed to "mak[e] arrangements" before signing the release and receiving any settlement funds. See Email Thread at 3, 5. Although Smith at times represented that his client would sign the release, he also made clear that he needed to "finalize everything" with Bussman and that Plaintiff would sign the release only after the necessary arrangements had been made. See id. at 3, 5. In turn, Kragouras acknowledged that the release could not be executed until Bussman straightened out his affairs. See id. at 4. Both parties, then, seemed to understand that key steps needed to be completed before they could finalize the agreement through the written release. See Perles, 473 F.3d at 1250–51 (finding significant that parties behaved as though there were more details to be "worked out").

Last, the character of the purported contract informs the Court's analysis of the parties' intent. This settlement is not of a kind that the parties are likely to have entered into lightly. One million dollars for a personal injury was surely a "major" transaction "involving a considerable amount of money" for Bussman. See Jack Baker, Inc. v. Off. Space Dev. Corp., 664 A.2d 1236, 1240 (D.C. 1995); see also Restatement (Second) of Contracts § 27 cmt. c ("whether the amount involved is large or small" is factor "which may be helpful in determining whether a contract has been concluded"). In addition to implicating a large sum of money, a settlement agreement would mark the culmination of a years-long odyssey in Bussman's life that began with a devastating car accident. It therefore "strains credulity" to suggest that Smith and Kragouras —

an attorney and insurance adjuster, respectively — "intended a single, undocumented telephone conversation to give rise to a mutually binding agreement" entitling Bussman to $1,000,000 and releasing Uber from liability for a major incident. See Perles, 473 F.3d at 1251.

In sum, "the fact that the parties clearly contemplated a written contract; the parties' post-conversation conduct evincing lack of agreement; and the large amount of money at stake," id. at 1251, all point to the conclusion that Kragouras and Smith did not intend to be bound by their oral conversation and therefore did not reach an enforceable agreement. On this record, then, the Court concludes that sufficient factual disputes exist to deny Defendants' Motions for Summary Judgment and to Enforce the Settlement.

### B. Fru

As Fru's arguments about the existence of an enforceable settlement agreement overlap entirely with Uber's, see Fru Mot. at 1 ("Mr. Fru adopts the argument set forth in Uber's Motion."), the Court thus also denies his Motion as it relates to the purported settlement. Fru, however, detours into two additional arguments for granting him judgment on Count X (negligence *per se* for statutory violations): 1) Plaintiff fails to plead sufficient facts to make out a negligence claim; and 2) the Distracted Driving Safety Act of 2004 violates the First Amendment. The Court need only address the first.

In his Complaint, Bussman relies on the D.C. Distracted Driving Safety Act of 2004, D.C. Code § 50-1731.01 *et seq.*, to bring his negligence *per se* claim. See Am. Compl., ¶¶ 106–19. The Act prohibits drivers from "us[ing] a mobile telephone or other electronic device while operating a moving motor vehicle in the District of Columbia unless the telephone or device is equipped with a hands-free accessory." D.C. Code § 50-1731.04(a); Am. Compl., ¶ 110 (citing statute). According to Plaintiff, because Fru was violating D.C.'s motor-vehicle safety laws at

the time of the collision, he *per se* behaved negligently. In response, Fru contends that Plaintiff has failed to allege that Fru "use[d]" a mobile device or, even if he did use such a device, that he did not also use a "hands-free accessory." Fru Mot. at 11–13. As a result, Defendant argues, Bussman has not properly alleged that he violated the Act.

Bussman, by neglecting to respond to either of these arguments, apparently concedes them. See Wannall v. Honeywell, Inc., 775 F.3d 425, 428 (D.C. Cir. 2014). In any case, the Court agrees that Plaintiff has not alleged that Fru used his cell phone without a hands-free accessory. The Act forbids cell-phone use only if the driver does not employ such an accessory, see D.C. Code § 50-1731.04(a), which it defines as "an attachment, add-on, built-in feature, or addition to a mobile telephone . . . that when used allows the vehicle operator to maintain both hands on the steering wheel." Id. § 50-1731.02(2). In his Complaint, Bussman states only that Fru received "notifications and messages" from the Uber app that he was required to "respond to" within "only 15 seconds," with no mention of how Fru received and responded to those communications. See Am. Compl., ¶¶ 98–100. As Fru points out, modern cell phones contain speakerphones and other increasingly advanced capabilities that could be used to interact with the Uber app without requiring the driver to physically engage with his device. See Fru Mot. at 11–12. Because Plaintiff has not alleged that Fru did not employ such a hands-free accessory while operating his mobile device, the Court will grant him judgment on Count X of the Complaint.

11

## IV. Conclusion

For the foregoing reasons, the Court will deny Uber's Motion and grant Fru's in part and deny it in part. A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: January 8, 2025